*This opinion is subject to revision before final
publication in the Pacific Reporter.*

**2013 UT 40**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

LAYNE JEX,
*Petitioner,*

*v.*

UTAH LABOR COMMISSION, PRECISION EXCAVATING, and OWNERS
INSURANCE COMPANY,
*Respondents.*

No. 20120347
Due July 9, 2013

On Writ of Certiorari to the Utah Court of Appeals

Attorneys:

Aaron J. Prisbrey, Trevor C. Sanders, St. George, for petitioner

Bret A. Gardner, Kristy L. Bertelsen, Salt Lake City, for
respondents Precision Excavating and
Owners Insurance Company

Alan L. Hennebold, Salt Lake City, for respondent Utah Labor
Commission

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE PARRISH joined.

JUSTICE LEE, opinion of the Court:

¶1    While traveling home from work in his personal vehicle, petitioner Layne Jex sustained back injuries in a roll-over accident. He filed a workers' compensation claim shortly thereafter, which was denied. Jex appealed, first to the labor commission and then to the court of appeals. In each forum, Jex argued that in light of the benefits his employer received through various work-related uses of his vehicle, he was "in the course of employment" during his accident and thus entitled to benefits under the Workers' Compensation Act. *See* UTAH CODE § 34A-2-401(1).

¶2    Both the labor commission and the court of appeals rejected Jex's claim under the general rule that employees are not in the course of their employment when traveling to or from work. In affirming the labor commission, the court of appeals also concluded that Jex did not qualify under the "instrumentality" exception to the "going and coming" rule. We affirm. We clarify the nature and scope of the going and coming rule and the instrumentality exception, conclude that Jex falls within the rule and not the exception, and reject Jex's claim to the benefit of "any doubt" about his right to workers compensation.

I

¶3    Jex began working for Precision Excavating as a heavy equipment operator in St. George, Utah. After a slump in the construction industry made work in St. George scarce, Jex accepted Precision's offer to work at a jobsite near Cedar City—some sixty miles north.

¶4    Though Jex and his fellow workers were ultimately responsible for making and paying their own way to the new jobsite, Precision designated a location for employees to meet to carpool together if they so desired. Precision also provided a company-owned truck at the meeting spot each day to ferry at least some employees. Jex rode in this truck several times, but drove his own vehicle most days. While traveling home from the jobsite in his vehicle on one such day, Jex sustained back injuries when his pickup truck rolled after a tire failure.

¶5    After the accident, Jex applied for workers' compensation benefits. His application was denied under the "going and coming rule"—a workers' compensation principle deeming injuries occurring during a work commute outside the "course of employment" and thus not compensable. Jex sought review of that denial before an administrative law judge (ALJ), contending that he qualified for an exception to the going and coming rule—an exception deeming a commuting accident in the "course of employment" if the vehicle is an "instrumentality" of the employer's business.

¶6    In advancing this exception, Jex claimed that his vehicle was employed for a number of business purposes, which in his view converted the vehicle into an instrumentality of Precision's business. First, Jex claimed that he provided transportation to Precision employees in his pickup truck. According to Jex, his super-

visor at Precision asked him on several occasions to wait ten extra minutes at the company-designated meeting spot to give a ride to a chronically late employee, Nick. Jex also asserted that, on the day of the accident, he approached his supervisor and asked if he should give another employee, James, a ride home, to which the supervisor responded "Yeah go ask if he wants to go now, and give him a ride." At the same time, the supervisor also asked Jex to give James the option of leaving with Jex or working overtime and riding home with the supervisor. For whatever reason, Jex did not relay the supervisor's second message to James, and the two left together in Jex's vehicle.

¶7  Next, Jex reported that he transported hydraulic fluid belonging to Precision and his personal tools—including a tape measure, a large pipe, a crescent wrench, a sledge hammer, a heavy chain, a trailer hitch, and a homemade level—in his pickup truck to Precision's jobsite for use there. Finally, Jex twice, at his supervisor's request, ran errands in his vehicle for Precision that required him to leave the jobsite and travel to Cedar City.

¶8  After hearing this evidence, the ALJ denied Jex's claim on the ground that these services were insufficient to qualify Jex for the instrumentality exception. As to Jex's transportation of Precision employees, the ALJ determined that the arrangement between Precision and Jex regarding Nick's ride to work was merely "loose cooperation" and "not mandated by the employer." In the ALJ's view, though Jex complied with Precision's requests concerning Nick, it was not a job requirement for him to do so. The ALJ further noted that, on the day of the accident, Jex "offered" to give his co-worker a ride home; it was not the result of an "employer instruction." And in the ALJ's view, the ride offered no benefit to Precision.

¶9  As to the personal tools Jex brought and used on the job site, the ALJ concluded that that "was not a job requirement, and was not necessary," because Jex was able to perform his job "without problem" the days he rode in the company truck and did not have his personal tools. Finally, the ALJ concluded that though Jex used his own vehicle for two errands, a company truck was available for use on both occasions, he was compensated for his time while on these errands, and the lack of employer control over the use of the truck weighed against a finding of compensability.

3

¶10 Jex renewed the same instrumentality arguments in a motion for review to the labor commission. But the labor commission agreed with the ALJ—expressly adopting the ALJ's factual findings—and denied benefits based on the going and coming rule.

¶11 Jex then appealed to the Utah Court of Appeals. The court of appeals began with the premise that "Utah's appellate courts . . . have not excepted an employee's travel to or from work from the usual rule when the travel did not confer a substantial benefit on the employer." *Jex v. Labor Comm'n*, 2012 UT App 98, ¶ 12, 275 P.3d 1078. It then invoked a "substantial benefit" requirement it found in past cases, including *Salt Lake City Corp. v. Labor Commission,* 2007 UT 4, 153 P.3d 179, as "a frame of reference for assessing" whether Jex's vehicle had become a limited purpose instrumentality based on its use on the day of the accident and whether it had become an all-purpose instrumentality based on the "totality of the circumstances" surrounding its use to benefit Precision generally. *Jex*, 2012 UT App 98, ¶¶ 13–16.

¶12 As to the former, the court concluded that Jex's transportation of James back to St. George on the day of the accident "was not required by Precision" and did not "provide the company with any substantial benefit." *Id.* ¶ 15. It thus determined that his vehicle was not an instrumentality on the day of the accident. *Id.* It reached the same conclusion on the second question. According to the court of appeals, "each of the activities Jex relie[d] on provided the employer with only minimal or occasional benefit" and the use of his vehicle to benefit Precision was typically "the result of his unilateral decision, rather than a requirement of his position." *Id.* ¶ 23. The court ultimately concluded that absent a showing of "more regular demands" on the use of Jex's vehicle or the presence of "a more pervasive benefit," the court would not disturb the commission's decision. *Id.*

¶13 Jex filed a petition for certiorari, seeking review of the court of appeal's decision that the "going and coming rule" defeated his claim for workers' compensation benefits because his vehicle did not qualify as an all-purpose instrumentality of Precision's business. We granted that petition.

¶14 We consider the court of appeals' decision under a correctness standard of review, affording no deference to its consideration of the labor commission's decision. *Newspaper Agency Corp. v.*

*Auditing Div. of the Utah State Tax Comm'n*, 938 P.2d 266, 267 (Utah 1997). In evaluating the correctness of the court of appeals' decision, however, we consider "whether the court of appeals reviewed the decision of the Commission with the appropriate standard of review." *Id.*

¶15 Whether the commission correctly or incorrectly denied benefits is "a traditional mixed question of law and fact." *See Murray v. Labor Comm'n*, 2013 UT 38, ¶ 34, __ P.3d __. "The standard of review we apply when reviewing a mixed question can be either deferential or non-deferential." *Id.* ¶ 36. Deference on a mixed question is warranted when "the mixed finding is *not* 'law-like' because it does not lend itself to consistent resolution by a uniform body of appellate precedent" or "*is* 'fact-like' because the [factfinder] is in a superior position to decide it." *Id.* ¶ 37 (internal quotation marks omitted).

¶16 Whether benefits are barred by the "going and coming" rule is such a mixed question. Given the varied factual postures possible in "going and coming" cases and the fact-intensive nature of the question, the matter does not lend itself easily to consistent resolution through a "uniform body of appellate precedent." *Id.* (internal quotation marks omitted). And because the ALJ and the commission have firsthand exposure to the evidence in such cases, their view of the matter is superior to ours. The commission's decision denying benefits is accordingly entitled to deference.

## II

¶17 Under our Workers' Compensation Act, employees who are accidentally injured "in the course of [their] employment" are entitled to compensation. UTAH CODE § 34A-2-401(1).[1] The Act itself does not define "course of . . . employment." But our cases have given content to that phrase over time, through rules and exceptions that offer shorthand grounds for deeming various ac-

---

[1] *See Allen v. Indus. Comm'n*, 729 P.2d 15, 18 (Utah 1986) (deciding that the Workers' Compensation Act "creates two prerequisites for a finding of compensable injury": (1) an accidental injury and (2) "a causal connection between the injury and the employment").

tivities either within or beyond a person's "course of employment."

¶18 At the core of this case is a judicially adopted principle known as the "going and coming" rule. *See, e.g.*, *Higgins v. Indus. Comm'n*, 700 P.2d 704, 707 (Utah 1985); *Covey-Ballard Motor Co. v. Indus. Comm'n*, 227 P. 1028, 1028 (Utah 1924). According to this rule, "accidents occurring to the employee while going to and from work" are generally not compensable because they are outside the course of employment. *Bailey v. Indus. Comm'n*, 398 P.2d 545, 546 (Utah 1965). Our cases have also recognized exceptions to this general rule—limited circumstances in which an accident in the course of "going and coming" is nonetheless within the course of employment. *See, e.g.*, *Tax Comm'n v. Indus. Comm'n*, 685 P.2d 1051, 1053–54 (Utah 1984) (cataloguing various exceptions to the going and coming rule).

¶19 The question before us is whether Jex qualifies for such an exception. The exception he has sought to invoke is the so-called "instrumentality" exception—an exception holding that even in going and coming a vehicle may be in the course of employment if it is an instrumentality of the employer's business in light of the employer's benefit from and control over it. *See Bailey*, 398 P.2d at 546–47. Jex seeks to invoke this exception, citing the benefits conferred on Precision's business by the use of his vehicle. Because he used his pickup truck to give rides to Precision employees, to carry tools to the jobsite for use, and to run occasional errands, in other words, Jex contends that his vehicle became an all-purpose[2]

---

[2] The court of appeals also considered whether Jex's vehicle was a limited-purpose instrumentality on the day of the accident—given that Jex was transporting a Precision employee when the accident occurred. But Jex does not pursue that line of argument here. We accordingly restrict our analysis to whether Jex's vehicle was an all-purpose instrumentality—whether it was so pervasive a part of Precision's business that it was always "in the course of employment" during all of Jex's commutes.

In so doing, we need not and do not endorse the legitimacy of a limited-purpose instrumentality exception. Such a notion would appear to be subsumed in the special errand exception, which brings within the course of employment "a special activity . . .

"instrumentality" of Precision's business, and thus that he was in the course of employment even in going and coming from work.

¶20  We disagree. Under a proper understanding of the instrumentality exception and its elements, which we clarify below, Jex's vehicle was not an instrumentality of Precision's business. Instead, we conclude that Jex fell squarely within the going and coming rule and thus that his accident was outside his "course of employment." In affirming the court of appeals on that basis, we also reject a fallback argument advanced by Jex—that he is entitled to the benefit of "any doubt" about the availability of workers' compensation benefits, and thus should prevail in light of a range of unresolved factual and legal questions implicated in this case.

A

¶21  The central statutory inquiry in workers' compensation cases is whether the injury occurred in the "course of . . . employment." UTAH CODE § 34A-2-401(1). Our cases, as noted, articulate subsidiary rules and exceptions that help define this standard. *See, e.g., Tax Comm'n*, 685 P.2d at 1053–54. But these conceptualizations are only tools in aid of the central statutory inquiry. They are not independent standards in themselves.[3]

¶22  Our objective in this or any statutory field is to fairly and faithfully apply the governing statutory text. *See, e.g., Myers v.*

---

which is reasonably undertaken at the request or invitation of the employer." *Drake v. Indus. Comm'n*, 939 P.2d 177, 183 (Utah 1997) (internal quotation marks omitted). Jex made a special errand argument in proceedings before the ALJ, but he did not renew that argument on appeal or on certiorari. That failure would appear to foreclose a parallel assertion that his vehicle was a limited-purpose instrumentality. And in any event Jex has pressed no such exception in his briefs or argument in this court.

[3] *See Lundberg v. Cream O'Weber/Federated Dairy Farms, Inc.*, 465 P.2d 175, 176 (Utah 1970) ("[R]eferring to [past caselaw] as 'exceptions' to the [going and coming] rule . . . is not strictly accurate. They are simply specific applications of the statute to particular fact situations."); *see also Salt Lake City Corp. v. Labor Comm'n*, 2007 UT 4, ¶¶ 20–27, 153 P.3d 179 (deciding that going and coming rule did not apply without reference to specific exceptions).

*Myers*, 2011 UT 65, ¶ 28, 266 P.3d 806. Thus, though our analysis is couched in terms of the subsidiary rules ("going and coming") and exceptions ("instrumentality") from our caselaw, the ultimate question is the statutory one—whether Jex's accident was in the "course of employment." That is the lodestar. The contours and scope of the rules and exceptions announced in our cases must be driven by the statutory standard. Not vice-versa.

¶23 That predicate informs our resolution of this case. Jex's claim is premised on an expansive conception of the instrumentality exception that finds some support in the dicta in our cases, but is ultimately irreconcilable with the statutory lodestar. Specifically, Jex asserts that a vehicle used for "going and coming" purposes falls within the "instrumentality" exception whenever its use confers any benefit on the employer—even absent any control or direction on the part of the employer.

¶24 We reject that conception of the instrumentality exception. We acknowledge dicta in our precedent that is susceptible to Jex's construction. But we conclude that the "any benefit" conception runs counter to the tenor of the exception as articulated in our caselaw. And, more fundamentally, we find that approach incompatible with the statutory standard, in that a "going and coming" commute that is only incidentally beneficial to the employer and not subject to its control does not bring the commute within the "course of employment."

1

¶25 We first recognized an instrumentality exception to the going and coming rule in *Bailey v. Industrial Commission*, 398 P.2d 545 (Utah 1965). That case involved a sole proprietor who ran a service station and used his own car to make emergency calls for his business, to carry tools that were necessary to repair the cars he worked on, and to loan to customers while he serviced their vehicles. *Id.* at 546. The proprietor also "carried the [car] upon his books as a business asset," "owned another automobile which was used as a 'family car,'" and charged the oil and gas as a business expense. *Id.* After the proprietor died in an accident on his way to work in the car, the predecessor to the labor commission (the industrial commission) denied his survivors' request for benefits under the going and coming rule. *Id.*

¶26 We reversed, citing two principal considerations. First, we noted that it was the proprietor's "regular and definite *duty* to take [and use the car] in the business." *Id.* at 547 (emphasis added). Second, we observed that by using his car, the proprietor was "performing . . . a *substantial service* required by his employment." *Id.* (emphasis added). The basis for our determination that the proprietor's car had become "an instrumentality" of the business hinged on employer control (via *duty*) and benefits conferred (via the *substantial service* performed). *See id.* Thus, in *Bailey* we determined that an employee is in "the course of [her] employment" if she is injured while subject to her employer's control and while benefiting the employer. *See id.*; *see also* BLACK'S LAW DICTIONARY 405 (9th ed. 2009) (defining "course of employment" as "[e]vents that occur or circumstances that exist as part of one's employment, [especially] the time during which an employee furthers an employer's goals through employer-mandated directives").

¶27 In the years since *Bailey*, we have continued to cite these two factors—employer control and benefits conferred—not only in applying the instrumentality exception,[4] but also as "the major focus in determining whether or not the general [going and coming] rule should apply in a given case," *Whitehead v. Variable Annuity Life Ins. Co.*, 801 P.2d 934, 937 (Utah 1989).

---

[4] *See, e.g.*, *Lundberg*, 465 P.2d at 176 (employee injured while traveling to specially-called meeting not within *Bailey* and *Moser* because "the use of [the plaintiff's] own car in going to work [was not] any such essential aspect of the carrying on of the business as to be regarded as an integral part thereof to take it out of the [going and coming rule]"); *Moser v. Indus. Comm'n*, 440 P.2d 23, 24 (Utah 1968) (employee injured while starting truck was in the course of employment because "in order to continue its function in the [employer's] business, it was necessary that someone take [the truck] down to the [employer's] terminal," that was the plaintiff's "duty," and the plaintiff was carrying out employer's instructions at time of the accident); *see also Cross v. Indus. Comm'n*, 824 P.2d 1202, 1205 (Utah Ct. App. 1992) (employee injured in personal vehicle on the way home from work not in the course of employment where ride-sharing program was merely one of "mutual convenience" rather than an employer requirement, and the only benefit conferred on employer was arrival at the jobsite).

¶28 Jex insists that we adopted a more permissive instrumentality standard in *Salt Lake City Corp. v. Labor Commission*, 2007 UT 4, 153 P.3d 179. He cites that case for the proposition that a mere incidental benefit to an employer—with or without any employer control—is enough to trigger the instrumentality exception. We reject that standard as incompatible with the tenor of our caselaw and, more importantly, with the statutory "course of employment" standard.

¶29 Our decision in *Salt Lake City Corp.* deemed an officer who was injured while traveling home in a patrol car in the city's "Take Home Car program" within the course of her employment. *Id.* ¶¶ 6, 26. In so holding, we suggested that "an employee may be eligible for workers' compensation benefits if the injury occurs while the employee is engaged in an activity that is at least incidental to employment." *Id.* ¶ 23. We also stated, citing *Black v. McDonald's of Layton*, 733 P.2d 154, 156 (Utah 1987), that "an activity is incidental to the employee's employment if it advances, directly or indirectly, his employer's interests." *Salt Lake City Corp.*, 2007 UT 4, ¶ 23 (internal quotation marks omitted). And we commented that "[i]n almost every instance," the question whether an employee is in the course of employment "can be reduced to one unit of measure—benefit." *Id.* ¶ 20.

¶30 Jex invokes these dicta in service of his position that his vehicle "had become an 'instrumentality' of Precision's business by benefitting Precision," emphasizing the premise that an activity incidental to employment is one that "advances, directly or indirectly, his employer's interests." *See id.* ¶ 23 (internal quotation marks omitted); *Black*, 733 P.2d at 156 (same). Because his vehicle advanced Precision's interests at least indirectly, Jex insists that it became an instrumentality of Precision's business without regard to any control or direction it may or may not have employed.

¶31 Jex overreads our opinion in *Salt Lake City Corp.* That opinion should not be construed to jettison the "control" factor or to distill the entire instrumentality inquiry down to the notion of "benefit." Our focus on benefit, rather, was in articulating a "utilitarian" standard for assessing "the degree of employer involvement in the activity in which the employee was engaged when the injury occurred"—a standard (of involvement) tied to the statuto-

ry criterion of injury in the "course of employment." *Salt Lake City Corp.*, 2007 UT 4, ¶ 20. And, although we emphasized benefit and seemed to minimize control, we did so in circumstances where only the former was in question, and where we assumed that the two elements would necessarily go hand-in-hand.[5] Thus, the notion of "benefit" as the sole "measure" of the instrumentality exception cannot be extended beyond the facts and circumstances of *Salt Lake City Corp.*, where the employer's control was evident—and indeed the vehicle in question was owned by the employer—and the only question was the extent of the benefit on the party exercising control.

¶32 Jex's construction is also contrary to the broader body of our caselaw in this field. The *Salt Lake City Corp.* dicta he cites is based on our decision in *Black*, and the *Black* opinion repudiates the notion of a benefits-only standard for the instrumentality exception. In *Black* we considered whether an employee injured on the way to an employer-sponsored softball game was "in the course of employment." 733 P.2d at 155–56. And in affirming the denial of benefits, we acknowledged that the employer "received no benefit from those games beyond the improved morale and enhanced camaraderie . . . ." *Id.* at 158. *Black* is thus impossible to square with a standard deeming any incidentally useful commuting activity an instrumentality of the employer. Surely enhancing morale and camaraderie "directly or indirectly" advances an employer's interests, yet in *Black* we determined that such benefit was not "significant enough to tip the balance" in favor of an award. *Id.* And in that case we emphasized the relevance of employer control by discussing the "[d]egree of employer initiative, promotion, and sponsorship"—a factor we deemed "clearly" to

---

[5] *Salt Lake City Corp.*, 2007 UT 4, ¶ 20 & n.2 (asserting that "the beneficiary of an activity will always be the party in whom vests the power to control its performance"); *id.* ¶ 24 (cataloguing the benefits to the city—of "having more officers available for immediate response," of "better care of patrol cars," and of "increased police visibility"—and noting the city's effective control in directing officers to be "prepared to respond to emergency calls at any time" and in having "at hand those items required to be kept in the take-home patrol cars, including their service gun, police radio, identification, flashlight, ticket book, report forms, and flares").

"point toward sufficient control to identify the activity with the employment." *Id.* at 157.

¶33 We therefore read *Salt Lake City Corp.* and *Black* as continuing rather than repudiating the two-fold standard in *Bailey*. Mere incidental benefit is not sufficient, standing alone, to sustain invocation of the instrumentality exception. An employer's control must also be evaluated.

¶34 Ejecting employer control from the conversation would yield unilateral control over the "course of employment" to the employee—who could transform any routine "going and coming" commute into an activity in "the course of employment" through the simple expedient of conferring a collateral benefit along the way. That would run counter to a major premise of our caselaw. *See Whitehead*, 801 P.2d at 937 ("The major premise of the 'going and coming' rule is that it is unfair to impose unlimited liability on an employer for conduct of its employees over which it has no control *and* from which it derives no benefit." (emphasis added)).

¶35 More importantly, it would override the statutory "course of employment" standard. Employment by nature is bilateral. And the "course of employment" can hardly be dictated at the employee's whim. *See* BLACK'S LAW DICTIONARY 405 (9th ed. 2009) (defining "course of employment" as "[e]vents that occur or circumstances that exist as part of one's employment; [especially] the time during which an employee furthers an employer's goals through employer-mandated directives").

¶36 A clerical office worker who goes to the gym after work or on weekends could be seen as conferring an incidental benefit on her employer in so doing. Yet there is no reasonable relationship between that activity and the clerical duties the employee was hired to perform. And the purely incidental benefits inuring to the employer (of having a fitter, healthier worker) cannot reasonably be deemed within the "course of employment."[6]

---

[6] *See Auerbach Co. v. Indus. Comm'n*, 195 P.2d 245, 248 (Utah 1948) (Wolfe, J., concurring) ("To allow [an employee injured on the way to a company-sponsored, volunteer basketball game on the theory that it directly or incidentally benefitted the employer] would be to hold, in effect, that all amateur athletes, playing on any sponsored team, are employees of the sponsor . . . .").

¶37 Thus, both factors—control and benefit—are relevant to the instrumentality inquiry. Their evaluation, moreover, is on a sliding scale. If an employer imposes a clear-cut requirement that an employee bring and use her car at work, for example, then we can probably presume that the employer is benefited, or deem any incidental benefit enough to bring the use of the vehicle within the course of employment. A loose request, on the other hand, might require a stronger showing of benefit to bring the use of the vehicle within the course of employment.[7]

¶38 Under that standard and in all cases, the ultimate question is whether the use of a vehicle in "going and coming" is nonetheless within the "scope of employment." And that question must be answered by considering and balancing both the benefit to the employer and the nature and extent of the employer's control.

B

¶39 We affirm the decision of the court of appeals under these principles. Because Jex has failed to show the degree of control or benefit necessary to bring him within "the course of employment" at the time of his injury, we conclude that the court of appeals was right to affirm the denial of his workers' compensation claim.

1

¶40 Jex attempts to demonstrate control by his employer by characterizing his actions as somehow "necessary" or "required" by Precision. But his assertions collide head-on with the findings of the ALJ, which were expressly adopted by the labor commission. And those findings have been unchallenged by Jex at all stages of his appeals—a fatal omission. *See Tillman v. State*, 2005

---

[7] We accordingly reject any general requirement of "substantial benefit" as a universal element of the instrumentality exception. Yet we affirm a variation on that principle in the context in which it was invoked by the court of appeals: Where employer control is lacking, a greater showing of benefit is required to sustain the conclusion that a vehicle employed for commuting purposes is nonetheless within the course of employment (as an instrumentality). We therefore accept the court of appeals' "substantial benefit" standard to the extent it is consistent with the sliding scale approach we articulate herein.

UT 56, ¶ 71, 128 P.3d 1123 (accepting factual findings as true if not challenged).

¶41 Jex maintains that he received "directives" to transport habitually late Nick and that he "believed it was a job requirement to transport fellow co-employees to work in his personal truck." And he asserts that his tools were "necessary" because some of Precision's tools were "the incorrect type" and that he used his tools frequently on site. In support of his view, Jex points to the errands he ran on Precision's behalf as justifying his conclusion that "[he] felt obligated" to ask if he needed to give a Precision employee a ride home the day of the accident.

¶42 Jex's points cannot stand in the face of the ALJ's unchallenged factual findings. The ALJ found that Precision required the use of Jex's truck for *none* of these activities. As to the ride arrangements for chronically late Nick, the ALJ determined that Jex's role was nothing more than "loose cooperation" and was "not mandated by the employer."[8] Thus, when Jex rode in the company truck or when Nick did not show up within the ten-minute waiting window, the ALJ found that Jex was not required and in fact did not arrange for Nick's transportation.

¶43 According to the ALJ, providing a ride for Nick was thus not a requirement of Jex's employment, but a mere request. Though a request by an employer evinces some degree of control over the employee—control inherent in the subordinate nature of an employee—the record here reveals that there was little to no effective control over Jex's decision to comply with Precision's request. Most importantly, it is clear from the record that if Jex had declined the invitation to give Nick a ride, no negative repercussions would have ensued.

¶44 The ALJ likewise found that giving a ride to James on the day of the accident was not required. Indeed, the ALJ deemed it

---

[8] The ALJ included its characterization of this relationship as "loose cooperation" under the heading "DISCUSSION AND CONCLUSIONS OF LAW." But whatever the heading, this was effectively a finding of fact, and we treat it as such. *See Zions First Nat'l Bank v. Nat'l Am. Title Ins. Co.*, 749 P.2d 651, 656 (Utah 1988) ("The labels attached to findings of fact or conclusions of law are not determinative.").

significant that Jex "*offered* the ride to his co-worker." Because Jex *offered* the ride, the ALJ found that everything surrounding the conversation about the ride was "best described as informational communication, not employer instructions." This is perhaps most clearly indicated by the fact that Jex's supervisor specifically told Jex to tell James that he could *either* go home with Jex *or* stay and work overtime. Thus, whether Jex gave James a ride home was up to James alone and beyond Precision's—or Jex's supervisor's—control.

¶45 The same can be said of the tools Jex brought to work. As the ALJ put it, "[Jex] was not required [to bring or use his tools] and [Precision] provided all necessary tools at the job site." For example, Precision testified that its truck had a ball and hitch that "could have been used to move the compressor" instead of it being moved by Jex's hitch. And the evidence indicated that Jex could complete his job "without problem on the days he rode [in the company truck] and did not have access to [his] tools." This strongly suggests that these tools were not "necessary" or required in any meaningful sense.

¶46 Finally, it is undisputed that Jex ran errands on Precision's behalf and that he was on the clock during those errands. Precision presumably had a good deal of control over Jex's behavior while on those errands. But Precision neither required nor asked Jex to take his own truck. Much like the use of the trailer hitch, company trucks "were . . . available for [Jex's] use on . . . the two days that he [ran] errands." Jex simply chose to use his own vehicle.[9]

¶47 In light of the ALJ's findings, we cannot agree with Jex that his activities were "required" or the result of a "directive." Rather, these activities ranged from unilateral decisions on Jex's part to arrangements of "mutual convenience" between Jex and his employer. There is little by way of employer control to assist Jex in his contention that he was in the course of employment the day of his accident.

---

[9] Had Jex's accident and injury occurred during one of these errands, he presumably would have had a good argument under the special errand exception that he was in the course of employment. *See supra* ¶ 19 n.2. But they did not, and he does not.

2

¶48 An examination of the benefits conferred on Precision does little to strengthen Jex's position. At the outset, we acknowledge that most of the activities in which Jex engaged did benefit Precision to some degree. For instance, Precision benefitted from (1) Jex and Nick showing up at work,[10] (2) Jex not having to walk distances to get tools from the company truck because he could use his own, (3) the use of Jex's chain and trailer hitch on occasion, and (4) Jex running errands. Considered together, these benefits are greater in significance than, say, the intangible benefits an employer might receive from his employees voluntarily playing in an approved, after-hours softball league. *See Black v. McDonald's of Layton*, 733 P.2d 154, 158 (Utah 1987). But they are not significant enough to sustain the overarching result sought by Jex—the conclusion that every work commute in his personal vehicle occurred within an instrumentality of his employer (and thus within the course of his employment).

¶49 First, the benefit of having employees show up to work is not a meaningful one in light of the "going and coming" rule (which deems the ordinary commute outside the course of employment). *Vitagraph v. Indus. Comm'n*, 85 P.2d 601, 607 (Utah 1938) ("[A]n employ[ee] going to and from his place of employment is not rendering any service, and begins to render such service only [after] . . . arriving at the place of his employment . . . ." (internal quotation marks omitted)); *see Cross*, 824 P.2d at 1205. And the remaining benefits—limited errand-running and the occasional convenience of having Jex's tools available and nearby— do not compare to benefits that we have found sufficient in other cases. In *Bailey*, for example, we described the use of the employee's vehicle as conferring a "substantial service" to the employer because it was regularly used to respond to emergency calls at all hours, to carry tools and implements necessary to service or repair customer automobiles, and as a loaner to customers. *Bailey*, 398 P.2d at 546–47 . Yet we nonetheless called the case "a close one"

---

[10] As the ALJ noted, however, giving James a ride home simply did not benefit Precision. After all, Jex and James were *leaving* work, and "[t]here [was] no indication that had . . . Jex not offered a ride to . . . James that [Precision's] work would have been in anyway hindered."

and only narrowly awarded benefits even though extensive employer control was proven. *Id.* at 546.

¶50 So, though Jex's vehicle yielded benefits for Precision, the benefits were sporadic, slight, and employee-initiated. And in light of the lack of control or direction by the employer in this matter, we agree with the court of appeals' decision upholding the commission's determination that these benefits were insufficient to transform an employee-owned commuting vehicle into an all-purpose instrumentality of the employer's business.

¶51 Weighing the factors of control by and benefit to the employer, we conclude that the court of appeals properly deferred to the commission's determination that Jex's truck was not an all-purpose instrumentality of Precision's business. Based on the ALJ's findings, which we accept as true, and on the commission's application of the law to those findings, which was entitled to deference, the court of appeals was right to conclude that Jex's pickup truck was not an instrumentality of Precision's business, and thus that he was acting outside the course of employment at the time of his injury.

C

¶52 In addition to asserting the merits of his position on the instrumentality exception, Jex also advances a fallback position. Citing dicta in a few of our cases, Jex insists that even if his position ultimately fails under the law as applied to the facts of his case, he should nonetheless prevail on his claim for benefits because there are "doubts" about the nature and application of the instrumentality exception—and because as an employee he is entitled to the benefit of "any doubt" on the matter. *See Salt Lake City Corp.,* 2007 UT 4, ¶ 16 (explaining that "we . . . look closely to assure ourselves that the Commission . . . has resolved any doubt respecting the right to compensation in favor of an injured employee").

¶53 This argument misperceives the dicta in our cases. Our hyperbole notwithstanding, it cannot literally be true that we resolve "any doubt" about the right to workers' compensation in favor of coverage. The judicial process is premised on doubt. In workers' compensation cases as in others, the supposed precondition for

litigation is uncertainty[11]—regarding unresolved legal questions, unknown results of factual discovery, or unpredictable decisions by imperfect decisionmakers under inherently subjective legal standards.

¶54 And of course there is uncertainty on all such points in a case like this one, which is why we judges (and lawyers) who are a part of it have jobs. That cannot be enough to generate a benefit-of-the doubt presumption in favor of coverage. If it were, workers' compensation litigation would be overwhelmingly lopsided, and the law would never evolve or be clarified because doubts would generate compensation awards instead of precedents.

¶55 Thus, the benefit-of-the doubt presumption in our cases must necessarily stand for something more modest. We now clarify that it does, while refining the dicta in our prior cases.

¶56 The benefit of the doubt owing to workers' compensation claimants comes at the back end of the litigation—after the judge (or commission) makes a run at resolving disputed questions of fact, at clarifying gray areas of law, and at applying the law to the facts of the case at hand. In the rare case where that process yields genuine doubt—in a dead heat without an apparent winner—*that* doubt should be resolved in favor of coverage. But otherwise the judge (or commission) is oath-bound to rule in favor of the party whose case is strongest under the law as applied to the facts. Such

---

[11] *See* Steven Shavell, *Suit, Settlement, and Trial: A Theoretical Analysis Under Alternative Methods for the Allocation of Legal Costs*, 11 J. LEGAL STUD. 55, 63 & n.36 (1982) ("Under the American system, there will be a trial if and only if the plaintiff's estimate of the expected judgment exceeds the defendant's estimate by at least the sum of their legal costs. The simple logic behind this result is that because the plaintiff and the defendant will save the sum of their legal costs by settling, the only factor that could lead to a trial is that the plaintiff's expectations as to the likelihood of success or the judgment that could be obtained are more optimistic than the defendant's . . . . This comports with the notion that what leads to litigation is uncertainty as to the law or as to the facts. Without such uncertainty, the plaintiff's beliefs about his changes or possible judgment could not differ from the defendant's." (citations omitted) (emphasis omitted)).

a judgment cannot be abandoned on the mere presence of doubt about the matter.

¶57  This clarification of the presumption renders its application here a nonstarter. We see Jex's case as the court of appeals did—as not presenting a "close question" on the applicability of the in-strumentality exception. *Jex v. Labor Comm'n*, 2012 UT App 98, ¶ 24, 275 P.3d 1078. Granted, Jex cited cases to support his view of this exception, and he offered some evidence weighing in favor of its application to his case. But that is hardly enough to qualify Jex for a benefit-of-the-doubt presumption in his favor. Like the ALJ, the commission, and the court of appeals, we must interpret the law and apply it to the facts at hand to evaluate the merits of Jex's claim to workers' compensation benefits.

¶58  And, having concluded that that claim fails under the law as we see it (just as the ALJ, the commission, and the court of appeals did before us), we must therefore rule against him. We ac-cordingly affirm.

_____