2021 UT App 1

# THE UTAH COURT OF APPEALS

ISRAEL VELASCO,
Petitioner,

*v.*

LABOR COMMISSION, RESPONSE TEAM 1 LLC, AND
ZURICH AMERICAN INSURANCE COMPANY,
Respondents.

Opinion
No. 20191003-CA
Filed January 7, 2021

Original Proceeding in this Court

Jared L. Mortenson, Attorney for Petitioner

Bret A. Gardner and Dori K. Petersen, Attorneys for
Respondents Response Team 1 LLC and Zurich
American Insurance Company

Christopher C. Hill, Attorney for Respondent
Labor Commission

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES GREGORY K. ORME and DIANA HAGEN
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Israel Velasco seeks review of the Labor Commission Appeals Board's (the Board) decision denying him a portion of his claimed temporary total disability benefits. We set aside the Board's decision and remand for further proceedings.

BACKGROUND[1]

¶2 While working for Response Team 1 LLC (Response Team) doing "restoration, carpet cleaning, and emergency flood work," Velasco suffered a serious laceration to his right index finger and hand on July 20, 2018. Response Team accepted liability for Velasco's injury.

¶3 Between the time of the accident and October 12, 2018, Velasco received treatment for his injury, including surgery on July 31 and a steroid injection on September 21. Velasco's doctor, Dr. Burrows, restricted him to light-duty work throughout this period, instructing him not to use his right hand. During this period, Response Team provided light-duty work for Velasco.

¶4 On October 12, 2018, Velasco attended a follow-up appointment with Dr. Burrows. After examining Velasco, Dr. Burrows reported that Velasco had experienced "significant improvement" after receiving the prior injection but was still having some pain. Dr. Burrows administered another injection and prescribed naproxen for pain. He again stated that Velasco should continue with light-duty work "at this stage" with "no use [of] the right hand" but that Velasco would be "released to full unrestricted work activities on 15 October."

¶5 At the October 12 appointment, Velasco attempted to schedule a follow-up appointment but was told that his medical bills had not been paid and that Dr. Burrows would not see him again unless he agreed to sign a form accepting financial responsibility for the bills. Velasco did not sign the form and did not see Dr. Burrows again "because he could not afford to pay the associated costs out-of-pocket."

---

1. We recite the facts as found by the Board, including findings by the administrative law judge, which the Board adopted. The factual findings are not in dispute.

¶6     "Following the [October 12] appointment, [Velasco's] right index finger pain increased and his ability to use the finger decreased." Nevertheless, on October 15, Velasco returned to full-duty work at Response Team, consistent with Dr. Burrows's recommendation. Velasco tried to resolve the billing issue with Response Team and its insurer. Response Team assured him "that the bills had been submitted for payment and that everything should be taken care of," but when Velasco tried to contact the insurer, his messages were not returned. Velasco became "[f]rustrated with the way he was being treated," so he started looking for other employment and hired a lawyer to help him with his claim.

¶7     On October 26, Velasco quit his job with Response Team. Velasco started working with a temporary employment agency on October 28. He "found temporary construction work that proved too painful with his right-hand condition and later accepted cleaning jobs he could perform with primarily one hand." "On March 18, 2019, Mr. Velasco began working in a restaurant, but the continued pain in his right hand interfered with his ability to perform all his duties. Mr. Velasco's last day of work at the restaurant was April 14, 2019 . . . ."

¶8     On March 25, 2019, Velasco received an evaluation by a new doctor, Dr. Warren. Dr. Warren recommended that Velasco's finger be amputated and opined that he could not work. He was evaluated by a surgeon, Dr. Wang, on April 9, "who noted that [Velasco] had experienced right index finger pain for the past nine months." Dr. Wang performed surgery to amputate Velasco's finger on May 2, and Velasco was released for full-duty work on May 28.

¶9     Velasco requested temporary disability compensation from July 20, 2018, through May 28, 2019. Following a hearing, an administrative law judge (ALJ) awarded these benefits. Response Team filed a motion for review asking the Board to modify the ALJ's decision, asserting that Velasco could not receive temporary compensation during the period from

October 15, 2018, when Dr. Burrows released him for full-duty work, and March 24, 2019, the day before Dr. Warren determined that he could not work.

¶10 The Board agreed with Response Team, concluding that "Velasco is not eligible for temporary disability benefits for the period of October 15, 2018, to March 24, 2019." The Board explained that "Dr. Burrows's opinion releasing Mr. Velasco to return to work without restrictions" along with "[t]he fact that Mr. Velasco returned to work for Response [Team] around the same time as his last treatment from Dr. Burrows" "is evidence that he could perform the duties of the character required in his occupation prior to his injury." The Board further explained that it did not view Velasco's own testimony of his limitations "as a competent evaluation of his physical condition sufficient to demonstrate total disability." Accordingly, the Board set aside the ALJ's decision as to temporary benefits between October 15, 2018, and March 24, 2019.

¶11 Velasco moved the Board to reconsider its decision, and the Board denied Velasco's request, explaining that if Velasco "believed he was truly unable to work after" obtaining the medical release from Dr. Burrows, he "must demonstrate such inability through competent and appropriate medical evidence."[2]

---

2. It is unclear to us why the Board believed that the evaluations of Dr. Warren and Dr. Wang could not provide competent evidence regarding Velasco's condition prior to the time of the initial March 25 appointment with Dr. Warren. Both doctors observed that Velasco's pain had been ongoing for some time, and their recommended treatment of amputation certainly suggests that Velasco's condition had worsened since his last appointment with Dr. Burrows. Moreover, since both doctors opined that Velasco should not be working in his condition, it would be reasonable to infer that Velasco's inability to work

(continued…)

¶12     Velasco now asks us to set aside the Board's decision as to temporary disability benefits.

ISSUE AND STANDARD OF REVIEW

¶13     Velasco asserts that the Board erred in denying him benefits because it erroneously relied solely on contemporaneous medical records to assess his temporary disability.[3] "Whether the [Board] correctly or incorrectly denied benefits is a traditional mixed question of law and fact." *Jex v. Utah Labor Comm'n*, 2013 UT 40, ¶ 15, 306 P.3d 799 (quotation simplified). "The level of deference to be granted such a decision depends on whether the question presented is more fact-like or more law-like." *Nielsen v. Labor Comm'n*, 2020 UT App 2, ¶ 9, 456 P.3d 1167.

---

(…continued)

began sometime prior to his first appointment with Dr. Warren. To be sure, it would have been more helpful had either doctor offered an opinion regarding whether Velasco would have been able to work during the period of October 15 to March 24. But the mere fact that Velasco did not meet with the doctors sooner does not necessarily limit the relevance of the medical evidence from Dr. Warren and Dr. Wang to the period after they examined Velasco.

3. Velasco also raises questions regarding the fundamental fairness of permitting Response Team and its insurer to avoid paying him benefits where his inability to obtain a medical work restriction prior to March 24 resulted from the insurer's failure to timely pay for his medical expenses. While we are troubled by this situation and the potential it creates for insurers to avoid payment by acting in bad faith, we need not analyze this question in light of our determination that the Board's findings do not support its determination not to award benefits.

¶14 Here, the factual findings are not in dispute.[4] Instead, the question before us is whether the facts as found by the Board entitle Velasco to temporary benefits between October 15, 2018, and March 24, 2019. Where "the ultimate question is the legal effect of the facts . . . rather than witness credibility or demeanor, our review of the ultimate question is non-deferential." *JBS USA v. Labor Comm'n*, 2020 UT App 86, ¶ 8, 467 P.3d 905 (quotation simplified); *see also Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 40, 308 P.3d 461.

ANALYSIS

¶15 "A [worker] may be found totally disabled if by reason of the disability resulting from [their] injury, [they] cannot perform work of the general character [they were] performing when injured, or any other work which a [person] of [their] capabilities may be able to do or learn to do." *Entwistle Co. v. Wilkins*, 626 P.2d 495, 497–98 (Utah 1981) (quotation simplified).

¶16 The Board made the following findings relating to Velasco's ability to work between October 18 and March 24: (1) Dr. Burrows released Velasco to "full unrestricted work activities on 15 October"; (2) at some point "[f]ollowing the [October 12] appointment" Velasco's "right index finger pain increased and his ability to use the finger decreased"; (3) after Dr. Burrows's medical release, Velasco returned to full-duty work at Response Team until October 26; (4) the reason for Velasco's decision to stop working for Response Team was his "frustration with how Response [Team] was handling the

---

4. Response Team frames this issue as a question of fact and urges us to defer to the Board's "findings." But Velasco does not appear to have contested any of the Board's findings. Rather, he disputes the Board's conclusion that it could not rely on non-medical evidence to support a determination that Velasco was disabled.

medical coverage for his work injury"; (5) Velasco started working with a temporary employment agency on October 28; (6) Velasco "found temporary construction work that proved too painful with his right-hand condition and later accepted cleaning jobs he could perform with primarily one hand"; (7) on March 18, "Velasco began working in a restaurant, but the continued pain in his right hand interfered with his ability to perform all his duties" and his "last day of work at the restaurant was April 14, 2019"; (8) on March 25, Dr. Warren reported that "Velasco's work injury resulted in chronic pain, deformity, and loss of use of his right index finger" severe enough to require amputation; and (9) Dr. Wang noted that Velasco "had experienced right index finger pain for the past nine months," diagnosed him with "probable neuroma and stiffness," and performed surgery to amputate his finger.

¶17    These findings do not support a legal determination that Velasco could "perform work of the general character he was performing when injured, or any other work which a [person] of his capabilities may be able to do or learn to do" during the entire period from October 15 through March 24. *See Entwistle*, 626 P.2d at 497–98 (quotation simplified). The Board's findings that Dr. Burrows released Velasco for full-duty work on October 15 and that Velasco, in fact, returned to full-duty work support a determination that he was not temporarily disabled as of October 15 and for some period thereafter.[5] However, the

---

5. While Dr. Burrows's release was prospective in nature—based on his assumption that the treatment provided on October 12 would allow Velasco to return to work—we cannot agree with Velasco that the prospective nature of the release prevented the Board from relying on it to determine that he was, in fact, able to perform his regular work at Response Team as of that date. Although Velasco asserts that his finger was "so painful and numb" that he "couldn't really use it," that he "could barely write," and that he "couldn't cut with his right hand" during the period between October 15 and October 26 when he was

(continued…)

Board's findings that construction and restaurant work were too painful for Velasco to perform[6] and that he had to seek one-handed work demonstrate that at some point after October 15, but before Velasco saw Dr. Warren, his ability to work diminished to an extent that he was again temporarily disabled. Moreover, the Board's findings regarding both Dr. Warren's and Dr. Wang's diagnoses and notes demonstrate that Velasco was

---

(…continued)

working for Response Team at full duty, neither the ALJ nor the Board made any findings regarding Velasco's condition during this period or found that he left his job with Response Team as a result of pain or inability to perform his work. Rather, both found that the reason Velasco left his employment with Response Team was his frustration with the delays in payments to his medical providers and lack of communication about his workers' compensation claim, and Velasco has not challenged these findings. The ALJ did find that "[f]ollowing the [October 12] appointment, [Velasco's] right index finger pain increased and his ability to use the finger decreased." However, the ALJ was silent as to whether or how this interfered with Velasco's ability to work for Response Team between October 15 and October 26.

6. Response Team asserts that the fact that Velasco continued to work during the claimed period of disability demonstrates that he was not disabled. However, "[t]he fact that an injured employee may be able to do some kinds of tasks to earn occasional wages does not necessarily preclude a finding of total disability to perform the work or follow the occupation in which [they were] injured." *Entwistle Co. v. Wilkins*, 626 P.2d 495, 498 (Utah 1981) (quotation simplified). Rather, the question is whether the employee can "perform the duties of the character required in [their] occupation prior to [the] injury." *Id.* Here, the Board explicitly found that Velasco's impairments made it too painful for him to work except in "jobs he could perform with primarily one hand."

disabled for at least some portion of the period between October 15 and March 24. Both doctors agreed that Velasco should immediately stop working. Dr. Warren described Velasco's pain as "chronic," and Dr. Wang stated that Velasco had experienced pain for the last nine months. Further, the fact that Dr. Warren recommended amputation by the time of the March 25 appointment, a drastic treatment not contemplated at the time of the October 12 appointment with Dr. Burrows, demonstrates that Velasco's condition had seriously deteriorated during the period for which the Board denied benefits.

¶18 Despite its findings, the Board concluded that it did not consider Velasco's testimony regarding whether he could perform certain work activities "as a competent evaluation of his physical condition sufficient to demonstrate total disability." Although it is the Board's prerogative to weigh the evidence, "it would be unjust and impermissible for the [Board] to obdurately ignore clear, credible and uncontradicted evidence so that its action is arbitrary and unreasonable." *Shipley v. C & W Contracting Co.*, 528 P.2d 153, 154–55 (Utah 1974) (recognizing the value of lay testimony regarding a claimant's employability, though ultimately upholding the Industrial Commission's impairment rating in light of other evidence supporting its decision). Essentially, despite substantial, uncontroverted evidence that Velasco's condition deteriorated to a degree that prevented him from working well before he received an official work restriction from Dr. Warren and required him to have his injured finger amputated—and despite making factual findings to that effect—the Board concluded that nothing short of a contemporaneous work restriction could overcome Dr. Burrows's October 15 release to full-duty work. Where it is objectively clear that Velasco's disability arose well before he met with Dr. Warren, we would be perpetuating a legal fiction to accept the Board's determination that the disability did not begin until Dr. Warren identified it.

¶19 The Board's elevation of contemporaneous medical evidence to the exclusion of all other evidence is inconsistent

with our jurisprudence and also objectively unreasonable. *See id.* After all, much of medical diagnosis is dependent on an injured person's own subjective reports of their pain and impairment. *See, e.g., Entwistle*, 626 P.2d at 497–98 (relying on a medical panel's opinion, which assessed the claimant's alleged temporary disability after the fact). Although a lack of contemporaneous medical evidence could certainly undermine a claim for temporary benefits, it cannot foreclose such a claim where other evidence supports a determination that the claimant could no longer perform their normal work duties.

¶20   Here, the Board explicitly found that Velasco's injury made it "too painful" for him to do construction work and "interfered with his ability to perform all his duties" as a restaurant manager. Because the test for temporary disability considers whether the claimant can "perform work of the general character [they were] performing when injured, or any other work which a [person] of [their] capabilities may be able to do or learn to do," *id.*, these findings establish that Velasco once again became temporarily disabled at some point after Dr. Burrows released him for full-duty work.

¶21   Neither the ALJ nor the Board made any findings regarding the precise date following Dr. Burrows's release that Velasco's pain began to interfere with his ability to work. We know only that Velasco began working for a temporary employment agency on October 28 and that at some point thereafter, his pain prevented him from performing construction work that the agency found for him. Thus, we must remand for the Board to make a determination regarding the date after the full-duty release when Velasco became temporarily disabled.

CONCLUSION

¶22   The Board's findings demonstrate that Velasco became temporarily disabled sometime after Dr. Burrows released him for full-duty work but before he met with Dr. Warren. Thus, the

Board erred in determining that Velasco could not obtain temporary disability benefits for any of the period between October 15 and March 24. Nevertheless, we cannot discern from the Board's findings the date when Velasco became unable to perform his normal work duties. Thus, we remand for the Board to make such a finding and to adjust Velasco's award of temporary benefits accordingly.

———————